UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**QUADIR ALLEN** | Crim. No. 18-216 (KM)<br><br>**OPINION & ORDER** |

**MCNULTY, District Judge**

Now before the Court is the motion of Quadir Allen, a federal prisoner, for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). He contends that the likelihood of COVID-19 infection while he is incarcerated, in combination with his health condition, constitutes an extraordinary and compelling set of circumstances that justifies his immediate release. For the reasons stated herein, that motion will be denied.

Mr. Allen pled guilty on April 3, 2019, to one count of possession of a firearm by a convicted felon, 18 U.S.C. § 922(g)(1), one count of possession with intent to distribute at least 100 grams of heroin, 21 U.S.C. §§ 841(a)(1) & (b)(1)(B), and one count of possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).[1] The Court imposed sentences of imprisonment totaling 120 months. (DE 45) After sojourns in other institutions, he is now serving that sentence at FCI Schuykill. His projected release date, assuming all credits, is August 9, 2026.

On January 3, 2022, Mr. Allen petitioned the warden for release. That request was denied in writing on January 22, 2022. (DE 50-1 at 2)[2]

---

[1] In between plea and sentencing, the case was reassigned from the late William H. Walls, U.S.D.J., to me. (DE 35)

[2] Section 3582(c) provides that a court may modify a term of imprisonment only "after the defendant has fully exhausted all administrative rights to appeal a failure of

On February 15, 2022, Mr. Allen filed the motion for compassionate release that is now before the Court. (DE 50).[3] He contends that his medical condition, including hypertension, obesity, and a history of smoking, place him at risk of severe complications from a COVID-19 infection while imprisoned. After obtaining prison medical records,[4] the United States filed a response. (DE 51)

I. **LEGAL STANDARDS**

Once a term of imprisonment has been imposed, the Court may modify it only under very limited circumstances. *In re Morris*, 345 F. App'x 796, 797–98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)). As relevant here, § 3582(c)(1) provides as follows:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
>
> > (i) extraordinary and compelling reasons warrant such a reduction; [. . .]
> >
> > and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . .

*See also United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020).

---

the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." The government acknowledges that the exhaustion requirement is met here.

[3]  The motion is ably briefed *pro se*.

[4]  The medical records, which the Court has filed under seal as DE 51-2, are here page-cited as "GX __".

The United States Sentencing Commission has promulgated a policy statement that, in relevant part, allows a court to grant compassionate release or a sentence reduction where: (i) extraordinary and compelling reasons warrant a reduction in a defendant's sentence; (ii) the defendant is not a danger to the safety of others or to the community; and (iii) release from custody complies with the § 3553(a) factors, to the extent applicable. U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 1B1.13 (U.S. SENTENCING COMM'N 2018).

The policy statement of the Sentencing Commission defines certain circumstances that qualify as extraordinary and compelling. U.S.S.G. § 1B1.13, Application Note 1(A)–(D). The application note lists three specific circumstances that the Bureau of Prisons ("BOP") may find extraordinary and compelling, which I summarize:

a) a terminal illness or a serious medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover;
b) the defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less; or
c) certain family circumstances exist where the defendant would be the only available caregiver for his or her minor child, spouse, or registered partner.

U.S.S.G. § 1B1.13, Application Note 1(A)–(C). In addition, the application note includes a catchall provision, which provides that "other reasons" may be sufficient if "[a]s determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in [the enumerated] subdivisions." *Id.*, Application Note 1(D).

That policy statement was enacted at a time when only the BOP could consider an application for compassionate release, however, and has not been amended since the enactment of the First Step Act conferred certain additional powers on the courts. In prior cases, I accepted the emerging near-consensus that where a defendant makes a motion under the First Step Act, the court is not bound by the application note. The U.S. Court of Appeals for the Third Circuit, in a precedential decision, has now joined that consensus:

> The first issue is whether the District Court was bound by the Commission's policy statement. We conclude that it was not.
>
> As the District Court noted, the text of the policy statement explicitly limits its application to Bureau-initiated motions. Thus, according to its plain language, the existing policy statement is not applicable—and not binding—for courts considering prisoner-initiated motions. In reaching this conclusion, we align with nearly every circuit court to consider the issue. *See United States v. Brooker*, 976 F.3d 228, 235 (2d Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 282 (4th Cir. 2020); *United States v. Shkambi*, 993 F.3d 388, 393 (5th Cir. 2021); *United States v. Elias*, 984 F.3d 516, 519–20 (6th Cir. 2021); *United States v. Gunn*, 980 F.3d 1178, 1180–81 (7th Cir. 2020); *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021); *United States v. McGee*, 992 F.3d 1035, 1050 (10th Cir. 2021); *United States v. Long*, 997 F.3d 342, 355 (D.C. Cir. 2021). *But see United States v. Bryant*, 996 F.3d 1243, 1247–48 (11th Cir. 2021).

*United States v. Andrews*, 12 F.4th 255, 259 (3d Cir. 2021).

Thus the Guidelines policy statement, designed to channel BOP discretion, does not limit what this Court may reasonably find to be "extraordinary and compelling." Still, it remains a relevant and valuable guide, and is properly considered by a district court:

> The [district] court correctly recognized that although the policy statement is no longer binding, it still sheds light on the meaning of extraordinary and compelling reasons. "It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.'" *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, ––– U.S. –––, 139 S. Ct. 1881, 1890, 204 L.Ed.2d 165 (2019) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3,

4

> 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013)). Because Congress reenacted the compassionate-release statute without any alterations to the phrase "extraordinary and compelling reasons," it was reasonable for the court to conclude that the phrase largely retained the meaning it had under the previous version of the statute. *See United States v. Johnman*, 948 F.3d 612, 619 (3d Cir. 2020) . . . .

*Andrews*, 12 F.4th at 260.

I therefore am guided by the policy statement, but consider the grounds asserted by the defendant, whether or not specifically authorized by the policy statement. In particular, I consider whether the grounds cited here rise to the level of extraordinary and compelling circumstances, and, if so, whether the statutory purposes of sentencing would nevertheless be unduly undermined if defendant were released.

## II. DISCUSSION

### A. Extraordinary and compelling circumstances

Mr. Allen's First Step Act application for reduction of sentence rests primarily on the danger to his health from COVID-19 in the institutional setting of FCI Schuykill. He states that he is in particular danger of serious consequences from a COVID-19 infection, given the aggravating medical conditions of obesity, hypertension, and a reported history of smoking.

I emphasize here, as I have done before, what is sometimes obscured in discussions of such First Step Act applications: A federal prisoner may suffer from ailments that would plague a person whether in or out of prison, and the prisons are, of course, obligated to provide adequate medical care. One must ask, however, whether there is something about *incarceration* that so *increases* the consequences to the prisoner as to set forth extraordinary and compelling circumstances. I therefore consider such factors as (1) Mr. Allen's claimed medical conditions, and the attendant risk that a COVID-19 infection would carry serious consequences; (2) the effect of COVID-19 vaccination on the foregoing; and (3) COVID-19 infection rates at FCI Schuykill.

5

### 1. Obesity, Hypertension, History of Smoking

The conditions of obesity and hypertension are documented in the prison medical records, and Mr. Allen reports a history of smoking. These medical conditions do not constitute extraordinary circumstances warranting release.

Courts, including this one, have routinely looked to the Centers for Disease Control ("CDC") for guidance as to conditions that place a person at particular risk of serious consequences from a COVID-19 infection. *See People With Certain Medical Conditions*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated as of Dec. 6, 2022) (cited herein as "CDC List").

"Older adults," i.e., those over age 65, are far more likely than young persons to suffer serious consequences, and account for some 81% of COVID-19 deaths. *Id.* At age 45, Mr. Allen is not an "older adult," and will not be one at the time of his presumptive release date.

Certain listed medical conditions are also recognized as risk factors for serious consequences from a COVID-19 infection. *Id.*[5] By "serious consequences," the CDC mean hospitalization, intensive care, being placed on a ventilator, or death. *Id.*

*Obesity* does indeed appear on the CDC List as a risk factor. Being overweight (BMI $\geq$25), obese (BMI $\geq$30), or severely obese (BMI $\geq$40) "can make you more likely" to suffer severe consequences as a result of a COVID-19 infection. *See* CDC List. Mr. Allen has weighed in the range of 259 to 267 pounds, and is 74" tall. (GX 28, 157–58). That corresponds to a BMI of 34.3, in

---

[5] The list, in abbreviated form, consists of Cancer, Chronic kidney disease, Chronic liver disease, Chronic lung disease (including "Asthma, if it's moderate to severe"), Dementia, Diabetes, Down syndrome, Heart conditions (and "possibly high blood pressure (hypertension)"), HIV infection, Immunocompromised state, Mental health conditions, Overweight and obesity, Pregnancy, Sickle cell disease, Smoking, Solid organ or blood stem cell transplant, Stroke, Substance use disorders, and Tuberculosis. *Id.*

the lower half of the obese range, and far from severely obese. https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html.

Hypertension is somewhat equivocally identified as "possibly" a risk factor on the CDC list: "Having heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly high blood pressure (hypertension) can make you more likely to get very sick from COVID-19." Mr. Allen's blood pressure readings have measured as high as 176/100 and as low as 139/89. (GX 1546–57). Those readings are well into the hypertensive range. https://www.cdc.gov/bloodpressure/facts.htm. However, a radiology exam was normal and revealed no evidence of an "acute cardiopulmonary process." (GX 72). This condition has been appropriately monitored by EKG and x-ray examinations, and treated with medications such as Carvedilol. (*See, e.g.,* GX 17–19, 37, 72).

The situation is complicated, however, by Mr. Allen's spotty compliance with his health care regimen. On December 30, 2021, Allen advised medical personnel that he was only taking his medications once per day, despite being instructed to take them twice per day. (GX 119-121). Medical personnel noted that he had not retrieved three medications prescribed for hypertension—aspirin, Coreg (the brand name for Carvedilol), or HCTZ (an abbreviation for hydrochlorothiazine)—from the prison pharmacy since July of 2021. *Id.* On June 30, 2022, Allen advised medical staff that he did not pick up the refills of Amlodipine that had been prescribed to him to help manage his hypertension. (GX 093-094). On or about July 18, 2022, Allen advised medical staff that he was not taking the water pill, ordered to assist with hypertension. (GX 080-081). Nor has he complied with medical advice to abstain from high-sodium foods. (GX 089-091, 102-103, 113-116). For example, commissary records as of August 17, 2022, show purchases of chips, Doritos, and soups.

I note in passing that the Court is not criticizing or blaming Mr. Allen for his medical condition. I cite these facts by way of assessing whether there is anything about incarceration in particular that would impair his self-care.

The Court is inclined to take Mr. Allen at his word that he formerly smoked. I note, however, that on July 6, 2022, he advised medical personnel that he had no history of smoking. (GX 89–91). For what it is worth, there seem to be no serious breathing difficulties, and his oxygen saturation levels ($SaO_2$) have ranged from 98% to 100%. (*E.g.,* GX 27, 80, 103).

Relief has generally been denied to non-elderly inmates based on a BMI in the 30-39 range, alone or in combination with hypertension and/or a history of smoking, especially, but not solely, for vaccinated individuals.[6] I note further that some 200 pages of medical records testify to conscientious medical care

---

[6] My own cases denying relief based on obesity in the >30 BMI range include *United States v. Matos*, No. CR 19-113 (KM), 2022 WL 702858, at *5 (D.N.J. Mar. 9, 2022) (citing cases of hypertension and obesity in both the pre-vaccination and vaccination era); *United States v. Darby*, No. CR 13-631 (KM), 2022 WL 1423089, at *4 n.5 (D.N.J. May 5, 2022) (citing cases involving multiple chronic conditions including hypertension and obesity); *United States v. Johnson*, No. CR 18-578-01 (KM), 2022 WL 901468, at *4 (D.N.J. Mar. 28, 2022) ("Even in the pre-vaccine era, "[m]ultiple courts in this District have denied compassionate release to inmates suffering from hypertension and obesity because this lower degree of risk does not establish extraordinary and compelling reasons to justify release on its own.")(citing *United States v. Manon*, No. CR 16-00460, 2022 WL 408958, at *3 D.N.J. Feb. 10, 2022).

Other examples include the following: *United States v. Stewart*, No. 08-00346, 2021 WL 2134937, at *3 (D.N.J. May 25, 2021) (Wigenton, J.) ("Thus, even placing Defendant's vaccination status and COVID-19 history aside, it is not clear that Defendant's obesity amounts to an extraordinary and compelling reason for early release." (internal citations omitted)); *United States v. Peterson*, 2021 WL 2156398, at *2 (E.D. Pa. May 14, 2021) (noting that the defendant "suffers from hypertension, asthma, and prediabetes and he is obese and a former smoker," but declining to find extraordinary circumstances justifying release); *United States v. Irizzary*, No. 14-652-13, 2021 WL 735779, at *6 (E.D. Pa. Feb. 25, 2021) (BMI of 33.1 of 38-year-old); *United States v. Garcia*, Nos. 09-224-01. 11-468-03, 2021 WL 719763, at *4 (E.D. Pa. Feb. 23, 2021) (a BMI of 31.8 and a history of smoking ten years earlier); *United States v. Gonzalez*, No. 14-00015, 2021 WL 662496, at *2 (E.D. Pa. Feb. 19, 2021) (noting that "numerous courts in this Circuit have held that a BMI around or moderately above 35 is insufficient" to justify release); *United States v. Hilario*, No. 18-161, 2021 WL 322899, at *3 (E.D. Pa. Feb. 1, 2021) ("Given Defendant's relative youth (33 years old) and his lack of other risk factors, his mild obesity [BMI of 32.2] does not constitute an extraordinary and compelling reason for his release."); *United States v. Concepcion*, No. 02-488, 2021 WL 50852, at *7 (E.D. Pa. Jan. 6, 2021) (BMI of 32.2); *United States v. Aguilar*, No. 18-CR-00275-LHK, 2020 WL 6081779, at *4 (N.D. Cal. Oct. 15, 2020) (relief denied to 27-year-old with BMI of 37.5); *United States v. Edison*, No. 12-225,  2020 WL 3871447, at *3 (D. Minn. July 9, 2020) (obesity alone (BMI of 35.4) "fails to meet the demanding standard for compassionate release.").

and responsiveness to complaints.

### 2. Vaccination

The likelihood of any further serious consequences from a COVID-19 infection has been greatly reduced by the vaccination of Mr. Allen and others at the prison, although Mr. Allen has more recently refused administration of a booster.

The available vaccines (Pfizer, Moderna, and Johnson & Johnson) have been shown to be highly effective at preventing infection. Just as important is that when people do experience breakthrough infections, they are "much less likely to experience severe symptoms than people who are unvaccinated." *See* The Possibility of COVID-19 after Vaccination: Breakthrough Infections, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html (last updated June 23, 2022). The wide availability of those vaccines tends to render the COVID-19 risk less extraordinary or compelling.

The rates are constantly changing, of course, but the CDC currently report the following data regarding hospitalizations, a proxy for severity:

> In November 2022, compared to adults ages 18 years and older who received an updated COVID-19 bivalent booster dose, monthly rates of COVID-19-associated hospitalizations were **16x Higher in Unvaccinated** and **2.7x Higher in Vaccinated Adults without an updated booster.** . . .

https://covid.cdc.gov/covid-data-tracker/#covidnet-hospitalizations-vaccination.

Those overall figures are further broken out for Mr. Allen's age cohort:

**29.9x** Higher in Unvaccinated Adults Ages 18-49 years

**3.2x** Higher in Adults Ages 18-49 years Vaccinated but Without an Updated booster

*Id.*

Breakthrough infections are a reality, and the virus develops new variants, requiring that scientific and medical conclusions be revised. Given the

9

current effectiveness of vaccines, however, courts including this one have often found vaccination to be highly relevant to the risks associated with COVID-19 infection. *See, e.g., Garrett v. Murphy,* 17 F.4th 419, 433 (3d Cir. 2021); *United States v. Battel,* No. 21-2151, 2021 WL 4550925, at *2 (3d Cir. Oct. 5, 2021) (finding that defendant failed "to make the threshold showing that 'extraordinary and compelling reasons' supported his release" where "infection rates were near zero in Battle's place of confinement, and Battle was completely vaccinated, giving him significant protection against reinfection."). This holding of my experienced colleague Judge Kugler is illustrative:

> Further, as Defendant is fully vaccinated against COVID-19, . . . he is substantially protected from COVID-19 infection and, in the case of another breakthrough infection, from severe symptoms, *see United States v. Williams*, Crim. No. 11-00421-1, 2022 WL 950994, at *2 (D.N.J. Mar. 29, 2022) ("If a defendant is vaccinated, many courts have found that there is an insignificant likelihood that the defendant 'will contract COVID-19 and become seriously ill.'" (citation omitted)) (collecting cases). The Third Circuit recently recognized in an unpublished decision that "[g]iven vaccine availability, a prisoner likely will not be able to prove that his personal risk of serious illness from COVID-19 is an extraordinary and compelling reason for release unless he can convincingly show that he is 'unable to receive or benefit from a vaccine' or that he 'remain[s] vulnerable to severe infection, notwithstanding the vaccine.'" *United States v. Estevez-Ulloa*, Crim. No. 21-2432, 2022 WL 1165771, at *2 (3d Cir. Apr. 20, 2022) (citing *United States v. Rucker*, 27 F.4th 560, 563 (7th Cir. 2022)).

*United States v. Bulaman,* No. CR 12-794 (RBK), 2022 WL 3913430, at *4 (D.N.J. Aug. 31, 2022).[7]

---

[7] Such holdings have spanned the initial, Delta and Omicron variant eras of this pandemic. *See also United States v. Gatson,* No. 21-2749, 2021 WL 5632079, at *1 n.1 (3d Cir. Dec. 1, 2021); *United States v. Battle,* No. 21-2151, 2021 WL 4550925, at *2 (3d Cir. Oct. 5, 2021); *United States v. v. Jerez Matos*, No. CR 19-113 (KM), 2022 WL 702858, at *3 (D.N.J. Mar. 9, 2022); *United States v. Turbides-Pena*, No. 17-339, 2021 WL 2310093, at *3 (D.N.J. June 7, 2021) (Chesler, J.) ("Given that Defendant is fully vaccinated against Covid-19, the risk of that illness due to continued incarceration has been substantially reduced and does not constitute an extraordinary and compelling reason for a reduction in sentence."); *United States v. Stewart*, No. 08-00346, 2021 WL 2134937, at *3 (D.N.J. May 25, 2021) (Wigenton, J.) (noting "with the

> Medical records disclose a history of COVID vaccinations and boosters:
>
> COVID-19 Moderna Vaccine 02/24/2021 Refused . . .
>
> COVID-19 Moderna Vaccine 04/24/2021 . . . Left Deltoid 0.5mL . . .
>
> COVID-19 Moderna Vaccine 05/25/2021  . . . Left Deltoid 0.5mL . . .

(GX 41, GX 67–68).

In early December 2021, however, Mr. Allen first failed to appear for a vaccination appointment, and on December 14, 2021, he refused administration of the Moderna booster.[8] (GX 177, 207). No particular reason is given for this change of heart.

A prisoner has the right to refuse vaccination, but the courts have rightly cast a skeptical eye on prisoners who refuse vaccination while simultaneously claiming that only release from prison will relieve the danger of COVID-19. The Seventh Circuit, for example, has taken a strong stance on refusal to be vaccinated, treating it as practically a disqualifier in most cases:

> [A] prisoner who remains at elevated risk because he has declined to be vaccinated cannot plausibly characterize that risk as an "extraordinary and compelling" justification for release. The risk is self-incurred. . . . The federal judiciary need not accept a prisoner's self-diagnosed skepticism about the COVID-19 vaccines as an adequate explanation for remaining unvaccinated, when the responsible agencies all deem vaccination safe and effective . . . . A prisoner who can show that he is unable to receive or benefit from a vaccine still may turn to this statute, but, for the vast majority of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an "extraordinary and compelling" reason for immediate release.

---

vaccine's protection . . . Defendant's susceptibility to renewed serious illness seems unlikely"); *United States v. Shumate*, No. 18-0645 (NLH), 2021 WL 2374621, at *2 (D.N.J. June 9, 2021) (Hillman, J.) (citing cases and noting "it is appropriate for courts to consider the vaccination status of a defendant when considering compassionate release motions").

I give comparatively little weight to the case law cited by defendant dating from March-May 2020, when the COVID-19 pandemic was new and vaccines had not been developed.

8   In November, 2021 he refused a flu shot. (GX 208).

11

*United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021).

One need not fully accept the Seventh Circuit position, however, to find pertinent the observations of the U.S. Court of Appeals for the Third Circuit in a recent unreported case:

> . . . Thomas argues that his request was denied because he received the COVID-19 vaccine and this reasoning, if widely adopted, could perversely encourage inmates to decline the vaccine. We disagree. The District Court appropriately recognized that Thomas's vaccination reduced the health risks he relied on in support of his motion. This conclusion does not reward inmates who decline opportunities for vaccination. District courts routinely deny compassionate release to inmates who refuse the COVID-19 vaccine because they have voluntarily failed to mitigate the very health concerns they identify in support of an early release. *See, e.g., United States v. Brinson*, No. CR 19-153 (SDW), 2021 WL 2451970, at *2 (D.N.J. June 16, 2021) (Wigenton, J.) ("[B]ecause Defendant was offered and refused the COVID-19 vaccine, he cannot establish that 'compelling and extraordinary reasons' justify his release." (internal citations omitted)); *United States v. Sawyers*, No. CR 15-00070-RSWL-1, 2021 WL 2581412, at *4 (C.D. Cal. June 22, 2021) ("The glaring consensus among district courts is that refusal of a COVID-19 vaccine subverts a defendant's compassionate release motion."), *appeal dismissed*, No. 21-50157, 2021 WL 6196971 (9th Cir. Oct. 18, 2021).

*United States v. Thomas*, No. 21-1645, 2022 WL 296594, at *2 (3d Cir. Feb. 1, 2022). In line with these *dicta* in *Thomas,* cases in this district denying compassionate release have routinely taken into account a prisoner's refusal to be vaccinated. *See, e.g., United States v. Manon*, No. CR 16-00460 (SDW), 2022 WL 408958, at *3 (D.N.J. Feb. 10, 2022) ("Despite being offered the COVID-19 vaccine and being "begged" by his medical provider to take the vaccine, Defendant has refused vaccination. . . . Clearly, Defendant is not in a condition 'that substantially diminishes' his ability 'to provide self-care within the environment of a correctional facility', as Defendant has rejected the opportunity for vaccination."); *United States v. Bonilla*, No. 20-0083, 2021 WL 3634181, at *2 (D.N.J. Aug. 17, 2021) (collecting cases holding that an

12

inmate's refusal to be vaccinated in the absence of a legitimate medical reason was fatal to establishing an "extraordinary and compelling" reason for compassionate release).[9]

To my mind, a prisoner's refusal to be vaccinated is relevant to but not dispositive of the compassionate release application. I am of course wary of creating a perverse incentive to forgo vaccination. And there is, as I observed in a recent case, reason to be skeptical of a prisoner who claims to fear for his life, yet refuses to take routine measures to protect himself against COVID-19 infection. *See United States v. Darby*, No. CR 13-631 (KM), 2022 WL 1423089, at *7 (D.N.J. May 5, 2022). *See also United States v. Ventura*, 2021 WL 1976697, at *2 (D.N.J. May 18, 2021) (Wigenton, J.) ( "[W]hen a movant insists that his health and well-being require that he be (compassionately) released from incarceration to counter the risk of COVID-19, such insistence rings hollow when the movant is unwilling to counter that risk by resorting to something far more ordinary – taking the vaccine – than the extraordinary remedy of compassionate release he seeks."); *United States v. Muntasir*, 2021 WL 2201651, at *5 (D.N.J. May 27, 2021) (Vazquez, J.) ("Defendant is within his rights to refuse the vaccine, but any corresponding argument that he must be released because of potential complications were he to contract the virus rings hollow."). If there were some particular medical contraindication or other bar to vaccination, I might take that into account. This record discloses none.

Finally, there is another, more general sense in which vaccination reduces the risk to Mr. Allen. BOP has made the vaccine available to all inmates under its supervision, and has administered over 345,560 doses systemwide. *See* https://www.bop.gov/coronavirus/. At FCI Schuykill, 169 staff members and 1255 inmates have been fully inoculated. *Id.* (Click through

---

[9] At least in this Court's experience, the situation in which the inmate permits vaccination but later refuses followups, is less common. *But see United States v. Klinger*, No. 3:19-CR-00033-01-TMB, 2021 WL 5042986, at *4 (D. Alaska Oct. 29, 2021) (denying compassionate release where inmate took one dose of the Moderna vaccine and refused the second dose)

13

to "individual facility stats.") Thus far, Mr. Allen's COVID-19 tests have been negative, and he has been asymptomatic. (GX 176). That may reflect no more than good luck, but alternatively he may be benefiting as a free rider on the herd immunity of the vaccinated prison population.

### 3. Infection Rates at FCI Schuykill

As noted, Mr. Allen has not contracted COVID-19 while incarcerated, but fears for his health if he should become infected. I therefore consider the current likelihood of Mr. Allen's contracting COVID-19 as a result of being incarcerated at FCI Schuykill. That likelihood is low. Clearly, many infections occurred, particularly in the earlier period of the pandemic, before vaccination was widely available. By mid-2021, however, infection rates in the prison system trended downward, largely as a result of distancing procedures and vaccination. The resulting herd immunity benefits all inmates, and the current low infection rates at FCI Schuykill bear that out.[10]

FCI Schuykill is a medium security federal correctional institution with an adjacent minimum security satellite camp. Currently the facility houses a total of 1194 inmates: 1078 in the FCI, and 116 in the camp. *See* https://www.bop.gov/locations/institutions/sch/index.jsp. Current and cumulative figures for COVID-19 infections at FCI Schuykill are as follows:

| Inmates Positive | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered |
|---|---|---|---|---|---|
| 2 | 3 | 0 | 0 | 475 | 73 |

*See* https://www.bop.gov/coronavirus/.

The first two columns represent current figures; the last four are cumulative since the beginning of the pandemic in 2020. The "recovered" figures testify to a past outbreak involving substantial numbers of positive COVID test results among the inmates and staff, but, fortunately, no deaths.

---

[10]    Much of Mr. Allen's motion is devoted to allegations of medical mismanagement and outbreaks of COVID-19 infections at FCI Danbury, where he was previously incarcerated. Since approximately May 2022, however, he has been at FCI Schuykill. I also give less weight to historical figures and more weight to current rates of infection.

14

Currently, the facility reports just two positive test results among inmates, and three among staff. In short, these current figures indicate a current low danger of infection, and zero cumulative deaths.

* * *

In short, there is no persuasive evidence that Mr. Allen's risk of contracting and suffering serious consequences from a COVID-19 infection are so extraordinary as to require his release. Mr. Allen's personal medical situation, whether taken in isolation or in the context of conditions at FCI Schuykill, does not support a finding of compelling and exceptional circumstances.

### B. § 3553(a) factors

Even if the circumstances were extraordinary, consideration of the sentencing factors under 18 U.S.C. § 3553(a) would weigh against an order of release. *See generally United States v. Doe,* 833 F. App'x 366 (3d Cir. 2020). Because the circumstances are not extraordinary, however, I consider the § 3553(a) factors only briefly.

The offenses of conviction are serious ones. Mr. Allen pled guilty to possession of a firearm by a convicted felon, possession with intent to distribute at least 100 grams of heroin, and possession of firearms in furtherance of a drug trafficking crime. He possessed significant quantities of cocaine and heroin, as well as loaded handguns. When approached by law enforcement, he fled and remained a fugitive for some ten days.

The defendant's record includes four prior felony convictions for various offenses, including weapons possession, drug offenses, and aggravated manslaughter. He also has a record of violating conditions of probation, suggesting that he is resistant to supervision and deterrence.

The 120-month sentence was well merited. A reduction in sentence would operate to the detriment of just punishment, as well as the goals of individual and general deterrence. The sentence was calculated to guard the community against violence and narcotics distribution by incapacitating the defendant for a significant period, a goal that would be undermined by early

release.[11] Even assuming all good time and other credits, the defendant's projected release date is August 9, 2026. Thus a grant of the motion would relieve defendant of a very significant portion of the sentence.

Release at the present time, even if the circumstances were compelling, which they are not, *see* Section II.A, *supra*, would tend to undercut the goals of sentencing as set forth in § 3553(a). For this alternative and independent reason I would deny the motion.[12]

## ORDER

**IT IS THEREFORE** this 19th day of January, 2023,

**ORDERED** that the motion for compassionate release (DE 50) is **DENIED**.

The clerk shall update the address of the defendant/petitioner, Quadir Allen, to FCI Schuykill, and shall send him a copy of this Opinion and Order by regular first-class mail. The clerk shall then close the file.

/s/ Kevin McNulty

───────────────────────────────
**KEVIN MCNULTY, U.S.D.J.**

---

[11] I note, by the way, that the defendant's medical conditions are of long standing. There can be no argument that they lessen the likelihood of recidivism.

[12] I note for completeness that the alternative relief of transfer to home confinement is unavailable. The Court has no authority to grant such relief, which is reserved to the BOP under 18 U.S.C. § 3624(c)(2). *See United States v. Voda*, 994 F.2d 149, 151–52 (5th Cir. 1993); *Aigebkaen v. Warden*, No. 20-5732, 2020 WL 6883438, at *4 (D.N.J. Nov. 24, 2020) ("Pre-release placement decisions, such as transfers to home confinement, are committed to the BOP's sole discretion."). If the court did possess the discretion to award such relief, it would not do so, for the reasons expressed above.